AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America,<br><br>v.<br><br>RODOLFO URIARTE,<br><br>Defendant. | Case No.    2:23-mj-06099-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about October 29, 2023, in the county Santa Barbara in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Justin Francis*
*Complainant's signature*

_____
Justin Francis, FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    November 28, 2023          _____
*Judge's signature*

City and state:   Los Angeles, California          _____
Honorable A. Joel Richlin
*Printed name and title*

AUSA: Declan T. Conroy

## AFFIDAVIT

I, Justin Francis, being duly sworn, declare and state as follows:

## INTRODUCTION

1.   I have been a duly sworn Deputy with the San Luis Obispo County Sheriff Department ("SLOSO") since January 2020. Additionally, I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2021.  Before January 2020, I was employed as a Police Officer for the Pismo Beach Police Department for three years and before then as a Police Officer for the Fullerton Police Department for three years.

2.   In March 2013, I graduated from the Golden West Community College Basic Law Enforcement Academy in Huntington Beach, California.  At the Basic Law Enforcement Academy, I completed approximately 780 hours of instruction in basic police practices and procedures.  I hold a Peace Officers Standards and Training Basic Certificate ("POST").

3.   Upon graduation, I was assigned to the Fullerton Police Department as a Police Officer and worked uniformed patrol for three years.  I then transferred to the Pismo Beach Police Department Patrol Division as a police officer and worked uniformed patrol for a total of one year.  While on patrol, I conducted, as well as participated in, numerous preliminary investigations including, but not limited to, missing persons investigations, crimes of burglary, robbery, sexual assaults,

identity theft, larceny, assaults, auto-theft, weapon(s) violations, mail thefts, and various narcotics related offenses.

4.    While employed by the Pismo Beach Police Department, I was assigned to the San Luis Obispo County Sheriff's Gang Task Force for approximately two years.  As a Gang Detective, I assisted with investigations on documenting gang members for previously reported incidents in various crimes including, but not limited to, wanted documented gang members and/or associates, gang enhancements, assaults, larceny, and narcotics investigations.  I have personally arrested and/or investigated subjects for the possession of controlled substances for sale, possession of weapons, stolen property and thefts.

5.    I have received numerous hours of in-service training, consisting of briefings, lectures, online training and classes on various subjects including, but not limited to, gangs, firearms laws, DNA collection, synthetic drugs, coroner investigations, search and seizure, narcotics update, domestic violence, narcotic trafficker's update, pharmaceutical drug abuse training, identity theft, drug abuse recognition, Officer Involved Shooting training, Field Sobriety Tests/DUI, training related to the field of narcotics and investigations of cellular phones and mobile devices, narcotic investigations including surveillance and arrest of narcotic suspects, and the handling of, weighing, and field testing suspected narcotics.

## PURPOSE OF AFFIDAVIT

6.    This affidavit is made in support of a criminal complaint and arrest warrant against Rodolfo Uriarte

("URIARTE"), for a violation of Title 18, U.S.C. § 922(g)(1):
Felon in Possession of Ammunition.

7.   This affidavit is also made in support of a search
warrant to search the following digital devices, currently in
the custody of the FBI, in Santa Maria, California, as described
more fully in Attachment A (the "SUBJECT DEVICES"):  a black
Samsung Galaxy with IMEI Number 353235112660703 ("SUBJECT DEVICE
1"), and a green Apple iPhone with a black case ("SUBJECT DEVICE
2").

8.   The requested search warrant seeks authorization to
seize the items described in Attachment B, which are the
evidence, fruits, and instrumentalities of violations of 21
U.S.C. § 841(a)(1) (Distribution of and Possession with Intent
to Distribute Controlled Substances); 21 U.S.C. § 846 (Attempt
and Conspiracy to Distribute and Possess with Intent to
Distribute Controlled Substances); and 18 U.S.C. § 922(g)(1)
(Felon in Possession of Firearms and Ammunition) (collectively,
the "SUBJECT OFFENSES").

9.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only, all amounts or sums are

approximate, and all dates and times are on or about those indicated.

### SUMMARY OF PROBABLE CAUSE

10.   On October 29, 2023, Santa Maria Police Department ("SMPD") officers saw a vehicle that lacked a front license plate.  The driver, later identified as Rodolfo Uriarte ("URIARTE"), refused to pull over after officers attempted to initiate a traffic stop, and led officers on a short pursuit to a residence in Santa Maria, California.  Once pulled over, SMPD officers determined that the car URIRARTE had been driving had false registration information, which led the officers to detain URIARTE and his passenger, a juvenile.  During a pat-down search of the juvenile, SMPD officers found two loaded firearms.

11.   After detaining URIARTE and the juvenile, SMPD officers determined that the vehicle URIRARTE was driving had been reported stolen.  A subsequent search of URIARTE's stolen vehicle revealed 91 rounds of ammunition, spread out between the trunk of the car and an Adidas bag in the rear passenger seat. The Adidas bag also contained approximately 95 grams of suspected methamphetamine in small baggies, and a scale with residue of suspected methamphetamine.

12.   As discussed below, URIARTE had been driving this stolen vehicle for at least a week, and had previously used it to sell methamphetamine.  Additionally, a preliminary search of SUBJECT DEVICE 1 pursuant to a state-issued search warrant revealed text messages concerning URIARTE's possession, purchase, and sale of firearms and ammunition, including

ammunition consistent with those found in the car URIARTE was driving.

13.  As further discussed below, URIARTE has a criminal history that includes multiple felony convictions, including for assault with a deadly weapon and inflicting corporal injury on a spouse or cohabitant, and is therefore prohibited from possessing a firearm or ammunition.

<u>STATEMENT OF PROBABLE CAUSE</u>

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    URIARTE Commits a Traffic Violation, Refuses to Comply with a Traffic Stop, and Leads Officers on a Pursuit**

15.  Based on my review of law enforcement reports and conversations with other law enforcement officers, I understand that, on October 29, 2023, at approximately 11:24 p.m., police officers with the Santa Maria Police Department ("SMPD") patrolling in the area of North Broadway and Donovan Road in Santa Maria, California saw a grey Lexus sedan (the "grey Lexus") driving without a front license plate in violation of California Vehicle Code 5200(a).  The officers responded by activating their emergency lights and attempting to pull over the car.

16.  The driver of the vehicle, who was later identified as Rodolfo Uriarte ("URIARTE"), refused to pull over.  Instead, URIARTE made a right turn onto West Donovan Road and continued driving at approximately 15 miles per hour.  During this time,

officers activated multiple horns and sirens -- in addition to the emergency lights -- but URIARTE did not stop or pull over.

17.   After driving approximately a half-mile on West Donovan Road -- all the while pursued by the SMPD officers -- URIARTE made a left turn onto North Curryer Street.  URIARTE then pulled into a driveway in front of a residence on North Curryer Street, at which point URIARTE turned off his car.

**B.    SMPD Officers Determine that URIARTE's Car Has False Registration Information**

18.   After the pursuit, an SMPD officer exited his police vehicle and, while remaining a safe distance from URIARTE's car, advised URIARTE to roll down all of his windows.  URIARTE refused.  The responding SMPD officers then waited for the arrival of additional units to assist with the traffic stop.

19.   Once a second SMPD unit arrived, three SMPD officers approached the grey Lexus, where they found URIARTE in the driver's seat and a juvenile sitting in the passenger seat. After approaching, one of the SMPD officers asked URIARTE for his license, registration, and insurance information.  URIARTE provided his license, but stated that he did not have his registration or insurance information.  At around the same time, SMPD dispatch advised the responding officers that the vehicle registration for the grey Lexus had expired in 2022. Nevertheless, one of the responding SMPD officers saw that there was a blue 2024 registration tab affixed to the license plate on the grey Lexus.  When asked about this discrepancy, URIARTE

claimed that the vehicle belonged to his girlfriend, and that he was not responsible.

20.    Shortly thereafter, while one of the responding officers was conducting a records check for URIARTE and the juvenile, another officer requested that SMPD dispatch provide a VIN verification for the last four numbers on the license plate affixed to the grey Lexus.  SMPD dispatch provided the corresponding VIN number for that license plate, which did not match the VIN number on the grey Lexus.  When asked about this additional discrepancy, URIARTE again stated that he was not responsible, as the car belonged to his girlfriend.

   C.    **SMPD Officers Detain URIARTE and the Juvenile, and a Pat-Down Search of the Juvenile Reveals Two Loaded Firearms**

21.    After learning this information about the car, SMPD officers removed URIARTE from the grey Lexus and conducted a pat-down search of his person.  SMPD officers then detained URIARTE for the remainder of their investigation of the grey Lexus.

22.    Next, SMPD officers removed the juvenile who had been sitting in the passenger seat of the grey Lexus and conducted a pat-down search.  During that pat-down search, SMPD officers found a loaded revolver in the juvenile's waistband.  SMPD officers then separately found a loaded semi-automatic handgun in the juvenile's left front pants pocket.  The officers thereafter detained the juvenile for the remainder of their investigation of the grey Lexus.

> **D.    SMPD Officers Determine that URIARTE's Grey Lexus Is Stolen**

23.    Once URIARTE and the juvenile had been detained, SMPD officers requested a records check for the VIN number visible on the grey Lexus.  SMPD dispatch advised the officers that the VIN number came back to a vehicle that had been reported stolen out of Hemet, California.

24.    An SMPD officer then examined the rear license plate, and saw that the rear license plate had been affixed above another license plate.  After removing the outer, visible plate, officers found the correct plate for the stolen vehicle.

> **E.    SMPD Officers Find Loaded AR-15 Magazines, 100 Grams of Methamphetamine in Plastic Baggies, and a Pocket Scale in URIARTE's Car**

25.    After determining that the car URIARTE had been driving was stolen, SMPD officers searched the grey Lexus.  That search revealed the following:

a.    Inside the trunk of the car, SMPD officers found a long plastic rifle case.  The rifle case, in turn, contained three AR-15 magazines, two of which were loaded with .223 ammunition.  In total, the trunk contained 53 rounds of ammunition.

b.    Inside a grey Adidas backpack that had been sitting on the rear passenger seat, officers found a box containing 38 rounds of 9mm ammunition, compatible with the semi-automatic handgun that was found on the juvenile.

c.    Separately, SMPD officers found multiple plastic baggies containing a substance consistent with methamphetamine

in the grey Adidas backpack, as well as a working pocket scale with residue on it.  The suspected methamphetamine in the plastic baggies weighed approximately 94.4 grams.  A test of the substance contained in one of the baggies returned positive for methamphetamine.[1]

        d.   In between the driver's seat and the center console, officers found a white glove tightly tied off in a knot.  Within the glove, officers found a substance consistent with methamphetamine.  The suspected methamphetamine in the glove weighed approximately 5.8 grams.

    **F.**    **URIARTE Is Arrested, and SMPD Find and Seize the Two SUBJECT DEVICES During a Search Incident to Arrest**

26.   After determining that URIARTE was a convicted felon, SMPD officers arrested URIARTE for violating, <u>inter alia</u>, California Penal Code 30305(A)(1) (Prohibited Person in Possession of a Firearm or Ammunition); California Penal Code 32310 (Possession of a Large-Capacity Magazine); California Health and Safety Code 11379(A) (Transportation of Controlled Substances); California Health and Safety Code 11378 (Possession of a Controlled Substance for Sale); California Vehicle Code Section 10851(A) (Taking a Vehicle Without the Owner's Consent); and California Vehicle Code 4463(A)(1) (Forging or Altering Vehicle Registration).

27.   During a search incident to URIARTE's arrest, SMPD officers found a black Samsung Galaxy cellphone ("SUBJECT DEVICE 1") inside URIARTE's front left pant pocket.  SMPD officers also

---

[1] All the suspected methamphetamine has since been submitted to a laboratory for testing.

found a green Apple iPhone ("SUBJECT DEVICE 2") inside URIARTE's front left pant pocket.  Officers seized both SUBJECT DEVICES.

28.  The SUBJECT DEVICES were booked by SMPD and held at a police station until agents with the Federal Bureau of Investigation took custody of the devices on November 17, 2023. The SUBJECT DEVICES are currently in the custody of the FBI, and are being held at the Santa Maria Resident Agency in Santa Maria, California.

### G.    URIRATE's Cellphone Contains Evidence of Possessing, Purchasing, and Illegally Selling Firearms and Ammunition

29.  On November 3, 2023, the Superior Court for the State of California, County of Santa Barbara authorized a warrant to search the SUBJECT DEVICES.  See Case No. 23SW167NC.

30.  Based on my review of reports generated after the SMPD's preliminary search of SUBJECT DEVICE 1, I understand that SUBJECT DEVICE 1 contained text messages regarding firearms and ammunition, including the following:

a.    On September 12, 2023, URIRATE sent a text message to an individual stating "I got a AR style rifle that shoots 308, gots a scope and little braces like legs to hold it up if you want to lay down and shoot[.]"

b.    In that same message, URIRATE stated that the gun he was offering "comes[] [w]ith 200 rounds and 2 clips it's bad ass homie[.]"

c.    In that same message, URIRATE explained that he was offering the AR-style rifle for sale because "I just need small ones right now[.]"

d.    In response to a follow-up question to the above-described messages asking URIARTE "how much were u looking to get for it," URIARTE said "1500 for everything."

e.    On September 14, 2023, URIARTE sent a text message to an individual asking for a "picture of the one I bought from you" because "it's stashed and where it's at nobody's home, but I got somebody who might want to buy it." The individual responded by sending a photograph of an AR-10 style rifle.  URIARTE responded to the photograph by stating "thank you homie."

f.    On October 22, 2023, URIARTE sent a test message stating, "Babe I have alot [sic] of guns."

g.    On October 27, 2023 -- two days before his arrest -- URIARTE sent a text message asking "[w]ho got straps for sale."  Based on my training and experience, I understand that "straps" is often used as slang for firearms.  URIARTE then sent a second message stating "I'm[] [l]ooking for 9mm bullets" -- the same caliber ammunition as was found in the Adidas bag in the stolen vehicle URIARTE was driving on October 29, 2023.

**H.    URIARTE Previously Used the Grey Lexus to Sell Methamphetamine**

31.    This was not the first time URIARTE had been observed driving the stolen grey Lexus.  Based on my review of footage from covert recordings and conversations with other law enforcement officers, I understand that, on October 19, 2023, law enforcement saw the grey Lexus parked in the driveway of URIARTE's mother's home, the same address to which URIARTE drove

on October 29, 2023.  During the surveillance, URIARTE was seen exiting the residence, entering the driver seat of the grey Lexus, and driving the grey Lexus away from the house.

32.  Later that day, URIARTE drove the stolen grey Lexus to a prearranged location to sell methamphetamine.[2]  Both before, during, and immediately after that drug transaction, URIARTE was the only person seen in or around the grey Lexus.

**I.    URIARTE Is a Documented Gang Member and a Tax Collector for the Mexican Mafia**

33.  Based on conversations with SMPD officers and my review of the arrest report, I understand that URIARTE is a documented member of the Northwest criminal street gang in Santa Maria, California.

34.  From these conversations and reports, I understand that the Northwest gang uses signs and tattoos associated with the New York Yankees logo, "NY."  At the time of his arrest, URIARTE was wearing a New York Yankees "NY" hat, possessed a New York Yankees "NY" wallet, and had a "NY" logo tattooed on his right hand.

35.  Additionally, a search of SUBJECT DEVICE 1 revealed the following text messages, among others, regarding URIARTE's work on behalf of the Mexican Mafia, a violent prison gang centered in Southern California:

a.  On August 7, 2023, URIARTE sent a series of text messages to an individual demanding payment on behalf of the "EME."  Based on my training and experience, I understand that

---

[2] The transaction involved a confidential source who was operating at the direction of law enforcement.

"La Eme" is a reference to the Mexican Mafia.  In these messages, URIARTE expressed in Spanish, among other things, that he would let a friend cut off the individual's penis if the individual lied to him.

b.   On October 17, 2023, URIARTE sent a text message in which he stated, "I represent the big homie and the Mexican mafia out here."

**J.   URIARTE Is a Convicted Felon**

36.   I have reviewed URIARTE's criminal history records and learned that he has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about May 9, 2005, URIARTE was convicted of a violation of California Penal Code Section 211, Second Degree Robbery, with an enhancement under California Penal Code Section 12022.5 for the Personal Use of a Firearm in the Commission of a Felony, and a violation of California Health and Safety Code Section 11379(a), Transportation of a Controlled Substance, in the Superior Court for the State of California, County of Santa Barbara, Case Number 1144083;

b.   On or about November 3, 2010, URIARTE was convicted of a violation of California Penal Code Section 245(a)(1), Assault with a Deadly Weapon, in the Superior Court for the State of California, County of Santa Barbara, Case Number 1346753; and

c.   On or about November 5, 2014, URIARTE was convicted of a violation of California Penal Code Section

273.5(a), Inflicting Corporal Injury to a Spouse or Cohabitant,
in the Superior Court for the State of California, County of
Santa Barbara, Case Number 1452870.

### K. URIARTE Is Facing a Pending State Charge for Attempted Murder

37.  URIARTE has a pending charge for Attempted Murder in
violation of California Penal Code Section 187(A).  Based on my
review of URIARTE's criminal history report, I understand that
URIARTE was arrested on or about June 4, 2022 in connection with
this case.

38.  Based on my review of the underlying reports from
this case and conversations with SMPD officers, I understand
that the victim in this case told law enforcement that URIARTE
punched and kicked her, and hit her with a lamp several times.
I also understand that the victim in this case told law
enforcement that URIARTE placed a firearm to her head and stated
that he was going to shoot her.

### L. Interstate Nexus

39.  On November 24, 2023 ATF Special Agent Chris Stantzos
examined all the ammunition that was recovered from the search
of URIARTE's car.  Special Agent Stanzos determined that all the
ammunition he examined had been manufactured outside the state
of California.  Special Agent Stanzos therefore concluded that,
if the ammunition had been possessed in the state of California
-- as it was here -- it would have traveled in interstate and/or
foreign commerce.

## TRAINING AND EXPERIENCE ON DRUG OFFENSES

40.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

   d. Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers
often keep records of meetings with associates, customers, and
suppliers on their digital devices and in their residence,
including in the form of calendar entries and location data.

   e. Drug traffickers often use vehicles to transport
their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

   f. Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate
on a cash basis.  Such currency is often stored in their
residences and vehicles.

   g. Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residence
or in safes.  They also often keep other items related to their
drug trafficking activities at their residence, such as digital
scales, packaging materials, and proceeds of drug
trafficking.  These items are often small enough to be easily
hidden and thus may be kept at a drug trafficker's residence

even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

41.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and /or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

42.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, _inter alia_, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or

remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

44. For all of the reasons described above, there is probable cause to believe that URIARTE has committed a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Ammunition), and that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found in a search of the SUBJECT DEVICES, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 28th day of
November 2023.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE